## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**DAMON REED**                                                                        **PLAINTIFF**

**v.**                                    **Case No.: 4:20-cv-01111-LPR**

**CITY OF CONWAY, ARKANSAS,** *et al.*                                    **DEFENDANTS**

## <u>ORDER</u>

Plaintiff Damon Reed is a Captain at the Conway Fire Department.  After being passed over for a promotion, Mr. Reed sued Defendant Michael Winter and the City of Conway under 42 U.S.C. § 1983, alleging First Amendment retaliation.[1]  Mr. Reed also sued Defendants under Arkansas law, alleging discrimination under the 34th Amendment to the Arkansas Constitution and a violation of Arkansas Code Annotated section 11-3-303.[2]

Defendants have filed a Motion for Summary Judgment.[3]  For the reasons that follow, the Court GRANTS summary judgment to Defendants on all of Mr. Reed's federal claims.  The Court declines to exercise supplemental jurisdiction over Mr. Reed's state law claims.  The state law claims will be DISMISSED without prejudice.

---

[1]  Compl. (Doc. 1) ¶¶ 1, 27–35.  In his Complaint, Mr. Reed also sued Bart Castleberry in his individual capacity. *Id.* at 1.  Mr. Reed has stipulated to the dismissal of Mr. Castleberry in his individual capacity.  Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 18) at 2 n.1.  Mr. Reed also sued Mr. Winter and Mr. Castleberry in their official capacities. Compl. (Doc. 1) at 1.  However, in the Eighth Circuit, "[c]laims against individuals in their official capacities are equivalent to claims against the entity for which they work . . . ." *Gorman v. Bartch*, 152 F.3d. 907, 914 (8th Cir. 1998).  Thus, the official capacity claims against Mr. Winter and Mr. Castleberry are really just claims against the City of Conway.

[2]  Compl. ¶¶ 36–46.

[3]  Defs.' Mot. for Summ. J. (Doc. 15).

# BACKGROUND[4]

In 1994, Mr. Reed was hired by the Conway Fire Department as a probationary Firefighter.[5] After a year, Mr. Reed's probationary period successfully ended and he became a "full-fledged" Firefighter.[6]  Mr. Reed served at the rank of Firefighter for about two years.[7]  Around September of 1997, Mr. Reed was promoted to the rank of Driver.[8]

## I.  The Founding of the Firefighter's Union and the Public Debate Over the Permanent Sales Tax Proposal

In 2000, Mr. Reed became a charter member of a firefighter's labor union—Local 4016.[9] Local 4016 is a branch of the International Association of Firefighters.[10]  The Fire Chief at the time (Bart Castleberry) did not join Local 4016 and was not pleased with its creation.[11]  Defendant Winter did not join Local 4016 either.[12]

At the inception of Local 4016, Mr. Reed was vice president of Local 4016.[13]  In 2001, he became president.[14]  At this time, the City of Conway was losing trained firefighters and police officers because it couldn't keep pace with the salaries that neighboring cities paid these civil

---

[4]  On summary judgment, the Court recites the genuinely disputed facts in a light most favorable to the plaintiff, including giving the plaintiff all reasonable inferences from the facts.  *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016).  Of course, the Court also relies on undisputed facts.  Essentially, the Court considers the most pro-plaintiff version of the facts that a rational juror could find on this record.  Accordingly, the Court's factual recitation is only good for the summary judgment motion.

[5]  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 9:24–10:2.

[6]  *Id.* at 10:7–12.

[7]  *Id.* at 10:17–19.

[8]  *Id.* at 9:19–10:21.

[9]  *Id.* at 48:15–16.

[10]  *Id.* at 97:12–18.

[11]  *Id.* at 188:7–9.

[12]  *Id.* 49:17–19.

[13]  *Id.* at 50:2–3.

[14]  *Id.*

servants.[15]  Mr. Reed took an active role to remedy the situation.[16]  He strongly advocated in favor

of a permanent sales tax increase to enable the City of Conway to remain competitive in terms of

pay.[17]  Mr. Reed's advocacy included his speaking to the media about the proposed tax.[18]

On September 4, 2001, Mr. Castleberry sent a memorandum to all fire personnel.[19]  This

memorandum told members of the Conway Fire Department not to "contact any Councilman or

the Mayor concerning any internal administrative fire matter, except via the chain of command or

by special permission of the Fire Chief" (Mr. Castleberry).[20]  This directive went further.  Mr.

Castleberry required all members of the Conway Fire Department to "immediately notify" him if

"contacted by a [C]ouncilman or the Mayor concerning any internal administrative fire matter . . .

."[21]  Finally, Mr. Castleberry prohibited any member of the Conway Fire Department from

referring "any citizen directly to a Councilman or the Mayor."[22]  Any citizen requests that could

not be handled by an officer were required to go up the chain of command.[23]

On September 10, 2001, Mr. Reed questioned Mr. Castleberry (in writing) about the

memorandum.[24]  Mr. Reed asked Mr. Castleberry to "define internal administrative fire matter."[25]

Mr. Castleberry responded and defined the term as "[a]ny fire department business or matter

---

[15]  *Id.* at 63:3–5.

[16]  *Id.* at 63:12–13.

[17]  *Id.* at 63:8–10.

[18]  *Id.* at 181:18–20.  Mr. Reed's efforts paid off, and the citizens of Conway passed the sales tax increase in 2001. *Id.* at 181:15–17; *see also id.* at 187:11 (Mr. Reed explaining that the citizens of Conway voted in favor of the tax in 2001).

[19]  Ex. 1 to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19-1) at 1.

[20]  *Id.*

[21]  *Id.*

[22]  *Id.*

[23]  *Id.*

[24]  *Id.* at 2.

[25]  *Id.* at 3.

pertaining to the Conway Fire Department[.] [T]his includes but is not limited to budget, staffing, policies, procedures, grievances, disciplinary matters, operations, planning, training, prevention … [or] <u>any</u> fire department business or matter."[26]

On December 10, 2001, Mr. Reed, on behalf of Local 4016, penned a formal letter to Mr. Castleberry.[27] Mr. Reed objected to Mr. Castleberry's memorandum.[28] Mr. Reed wrote that the memorandum violated the First Amendment to the United States Constitution.[29] Mr. Reed relied on Supreme Court cases to express his belief that "employees of a local government, like other citizens, have the First Amendment right to speak out about matters of public concern."[30] Mr. Reed also pointed out that Mr. Castleberry's memorandum was egregious because it constituted a "prior restraint."[31] Mr. Reed concluded the letter with a request that Mr. Castleberry "reconsider the memo and allow [the firefighters] to enjoy [their] First Amendment right of free speech."[32] No direct response to Mr. Reed's letter appears in the record.

On March 21, 2002, an attorney for Local 4016 wrote to the then-Mayor of Conway, Tab Townsell.[33] By and large, this letter repeated the sentiments that Mr. Reed had expressed in his letter to Mr. Castleberry.[34] The letter explained that local-government employees enjoy free speech rights when speaking out on matters of public concern.[35] The letter told Mayor Townsell

---

[26] *Id.* Mr. Castleberry did except from this definition any "unethical, immoral, or illegal activity by the Fire Chief in which case the matter should be reported to the Mayor." *Id.*

[27] *Id.* at 4.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.* at 5.

[33] *Id.* at 6.

[34] *Id.* at 6–7.

[35] *Id.* at 6.

that Mr. Castleberry's memorandum constituted an "unlawful prior restraint and a violation of the constitutional right of a public employee to engage in free speech about matters of public concern."[36]  The letter concluded with a request for Mayor Townsell to "take action to correct this situation."[37]

On June 12, 2002, Mayor Townsell sent out a memorandum to "All Department heads and Employees."[38]  The memorandum was meant to "clarify some confusion about an employee's right to contact [Mayor Townsell] and/or exercise their right of free speech."[39]  Mayor Townsell said that an employee must notify his or her department head before exercising his or her "right to contact the Mayor . . . ."[40]  Mayor Townsell cabined the notice requirement by saying that prior approval was not required to speak with him and that the prior notice requirement did not apply when an employee had information "about a Supervisor, Department Head, or other employee concerning activities or actions of an illegal or unethical nature . . . ."[41]  The memorandum informed employees with grievances to follow the established grievance procedure.[42]  Employees were allowed to contact the Human Resources Director about personnel matters.[43]  Finally, Mayor Townsell said, "By virtue of the First Amendment, employees have the right to express themselves about matters of public concern, but they do not have the right to disrupt the workplace or impede other employees' ability to perform their duties."[44]

---

[36]  *Id.* at 6–7.

[37]  *Id.* at 7.

[38]  *Id.* at 10.

[39]  *Id.*

[40]  *Id.*

[41]  *Id.*

[42]  *Id.*

[43]  *Id.*

[44]  *Id.*  It seems that the members of Local 4016 did not get the memo.  On June 18, 2002, Local 4016 (through an attorney) again wrote to Mayor Townsell.  *Id.* at 8.  The letter said that the attorney's previous letter and Mr. Reed's

## II.  Mr. Reed's 2010 and 2012 Lawsuits

In 2003, Mr. Reed was promoted from Driver to Lieutenant.[45]  At this point, Mr. Reed's climb up the ladder stalled for approximately seven years.  In 2010, Mr. Reed addressed the stall by filing a lawsuit against the City of Conway, Mayor Townsell, and Mr. Castleberry.[46]  In the lawsuit, Mr. Reed claimed that he was not promoted to the rank of Captain because of his participation in Local 4016.[47]  The 2010 lawsuit settled in 2011.[48]  As part of the settlement, Mr. Reed attained the rank of Captain retroactive to 2008.[49]  On March 10, 2011, Mr. Reed began his work as a Captain.[50]

The 2010 lawsuit was not Mr. Reed's only legal scuffle with the powers that be in the City of Conway.  On September 18, 2012, a class action was brought against the City of Conway in state court (which eventually settled in 2019).[51]  The class action was styled *Richard Shumate Jr. and Damon Reed on behalf of themselves and all similarly situated persons and entities v. City of Conway, Arkansas* (*Shumate*).[52]  Richard Shumate was one of two lead plaintiffs and represented

---

letter were "ignored" by the City of Conway.  *Id.*  Local 4016 assumed "that no remedial action has been taken to rescind the unconstitutional policy which prohibits employees from communicating" with the Mayor or the City Council.  *Id.*  At bottom, the firefighters wanted to know if they would face discipline for exercising their "First Amendment rights of free speech . . . ."  *Id.*  The letter then provided hypothetical situations to the Mayor and asked if each situation violated the existing policy established by Mr. Castleberry's memorandum.  *Id.*  For instance, the letter asked, "If a fire fighter expressed concern directly to you, as the Mayor, or to a City Council member, regarding deficient dispatching procedures or slow fire and rescue response times, would it violate the existing policy?"  *Id.*  The letter closed with a request to provide answers to the hypothetical situations and threatened legal action if the unconstitutional policy was allowed to remain in effect.  *Id.*

[45]  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 10:25–11:13.

[46]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶¶ 7–8.

[47]  *Id.* ¶ 8.

[48]  *Id.* ¶ 9; Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 12:19–22.

[49]  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 11:14–17.

[50]  *Id.* at 13:1–3.

[51]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶¶ 10, 120.

[52]  *Id.* ¶ 10.

Conway police officers.[53]  Mr. Reed was the other lead plaintiff, representing all employees of the

Conway Fire Department (which at the time included Mr. Castleberry and Mr. Winter).[54]  The case

involved claims against the City of Conway for illegal exaction and breach of contract.[55]  At

bottom, the plaintiffs claimed that the City of Conway was not properly using revenue generated

from the 2001 sales tax (the one that Mr. Reed helped to get passed) to compensate uniformed

personnel.[56]

### III.  Mr. Reed's Opportunity to Become a Battalion Chief

In February of 2014, Mayor Townsell tapped Michael Winter as the new Fire Chief.[57]  In

December of 2014, one of the six Battalion Chief positions opened up.[58]  The rank of Battalion

Chief is one rung above Captain (Mr. Reed's rank).[59]  Battalion Chiefs make $12,000 more per

year than do Captains.[60]  Mr. Reed applied for but did not get this promotion.[61]  Mr. Reed said that

this got him thinking that, if he was going to achieve the rank of Battalion Chief, he did not "need

to be in a union leadership role . . . ."[62]  Mr. Reed believed that a Battalion Chief "does not need

---

[53]  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 62:10–12.

[54]  *Id.* at 62:13–17; Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 12.  On September 26, 2014, Mr. Reed sat for a deposition in the *Shumate* class action.  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 150.  On January 29, 2015, Mr. Reed "swore out an affidavit in *Shumate*."  *Id.* ¶ 151.  Beyond these two instances, the record does not reveal that Mr. Reed (aside from his being a named plaintiff) had any other personal involvement in this case after January of 2015.

[55]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 12.

[56]  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 62:16–63:1.

[57]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 14.  In July of 2013, Mr. Castleberry retired from his position as Fire Chief.  *Id.* ¶ 13.  He became the "Director of Permits and Inspectors for the City."  *Id.* ¶ 16.  Brian Moix briefly served as interim Fire Chief while the City of Conway searched for Mr. Castleberry's permanent replacement.  *Id.* ¶ 14.

[58]  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 50:14–15; *see id.* 175:17–18 (Mr. Reed testifying that there have always been six Battalion Chiefs).

[59]  *Id.* at 13:14–17.

[60]  *Id.* at 45:4–7.

[61]  *Id.* at 51:14–15.  Mr. Reed's suit is not based on the 2014 opening.

[62]  *Id.* at 50:16–18.  Mr. Reed does not suggest that anyone else thought this, or said something to him like this.  Rather, this was Mr. Reed's own supposition.

to be union president."[63]   Battalion Chiefs must discipline firefighters.[64]   Mr. Reed said that conflicts could arise by virtue of his having to discipline union members while at the same time being president of the union.[65]   Mr. Reed thus resigned as president of Local 4016 in March of 2015.[66]   Since that time, the only "conduct [Mr. Reed] has engaged in on behalf of the union has been as one of the lead plaintiffs in the [(2012)] *Shumate* lawsuit."[67]

In November of 2016, Mr. Castleberry (the former Fire Chief) became the Mayor of Conway.[68]   A little less than a year later, in September of 2017, Mr. Reed re-engaged in the process to become a Battalion Chief.[69]   The road to Battalion Chief begins with a testing cycle.   The testing cycle occurs annually whether an opening for Battalion Chief exists or not.[70]   When testing is complete, candidates' composite scores are tabulated.[71]   Candidates are then ranked "highest to lowest, based on their composite score . . . ."[72]   After that, the Fire Chief presents the scores to the

---

[63]   *Id.* at 51:5–6.

[64]   *Id.* at 51:8–9.

[65]   *Id.* at 51:5–11.

[66]   *Id.* at 50:9–12.

[67]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 149.

[68]   *Id.* ¶ 17.

[69]   *Id.* ¶¶ 18, 20.

[70]   *Id.* ¶¶ 28, 32–33.   The testing cycle occurs over the course of one week and has three stages.   *Id.* ¶¶ 32–33.   First, qualified candidates take a written exam administered by a testing company.   *Id.* ¶¶ 27, 29.   A candidate must pass this exam to continue to the other stages.   *Id.* ¶ 32.   The written exam makes up forty percent of a candidate's composite score on the testing cycle.   *Id.* ¶ 26.   Second, candidates participate in an "'inbox exercise,' which consists of prioritizing 10 items that a Battalion Chief would normally have to work through before a shift."   *Id.* ¶ 32.   The inbox exercise counts for 20% of the candidate's composite score."   *Id.*   Third, a candidate goes through a "practical exercise," which accounts for the remaining forty percent of a candidate's composite score.   *Id.*

[71]   *Id.* ¶ 34.

[72]   *Id.*

Conway Civil Service Commission.[73]   The Commission certifies the list of rankings.[74]   The certified list of rankings is good for one year.[75]

If a position opens up during that year, the three highest-scoring candidates interview with a panel of Chiefs.[76]   The panel consists of all six Battalion Chiefs and all three Assistant Chiefs, but not the Fire Chief.[77]   The Chiefs panel interviews the three candidates on the same day.[78]   After the interviews, the panel members cast a secret written vote, "resulting in the panel's recommendation to the Fire Chief of a particular candidate for the promotion."[79]   After the vote, the Fire Chief joins the panel members and counts the votes.[80]   The Fire Chief then announces (to the panel only) the name of the candidate with the most votes.[81]   The Fire Chief also asks the panel if any further discussion is necessary regarding the candidate with the most votes.[82]   "The custom and practice at the time [of the events in this case] was to promote those who got the [most] vote[s] . . . ."[83]   The Fire Chief, however, makes the final call on whether a particular candidate gets promoted.[84]

---

[73]   *Id.*

[74]   *Id.*

[75]   *Id.* ¶ 35.

[76]   *Id.* ¶ 36.

[77]   *Id.* ¶¶ 36, 38.

[78]   *Id.* ¶ 36.

[79]   *Id.* ¶ 39.   Before Chief Winter served as Fire Chief, the panel conducted a verbal vote.   *Id.* ¶ 40.   Chief Winter instituted the change to written votes.   *Id.*

[80]   *Id.* ¶ 41.

[81]   *Id.*

[82]   *Id.*   Mr. Reed denies this statement, but his denial goes to the ultimate outcome of the promotion and not to whether the Fire Chief asks about any issues with a particular candidate.   *Id.*   There is no dispute that the Fire Chief asks the Chiefs panel whether there are any issues with a recommended candidate.

[83]   *Id.* ¶ 41.

[84]   *Id.* ¶ 42.

By January of 2018, Chief Winter knew that one Battalion Chief position was opening up because Battalion Chief Jerry Gipson was being promoted to Assistant Chief in February of 2018.[85] There was also a strong possibility that another Battalion Chief, Mark Jones, was going to retire in May of 2018.[86]  To fill the guaranteed spot and the potential spot, the Conway Fire Department relied on the results of the 2017 testing cycle.  Mr. Reed had the highest composite score on the 2017 testing cycle for Battalion Chief.[87]  Joshua Odom came in second.[88]  Chad Johnson came in third.[89]  Jeff Moix had the fourth highest score.[90]

In January of 2018, the Chiefs panel interviewed candidates for the potential Battalion Chief positions.[91]  For the guaranteed February 2018 opening, the panel interviewed Mr. Reed, Mr. Odom, and Mr. Johnson.[92]  Mr. Johnson received the panel's recommendation.[93]  Chief Winter announced that Mr. Johnson would receive the promotion.[94]  The panel reconvened on the same day to consider Mr. Reed, Mr. Odom, and Mr. Moix for the possible May 2018 opening.[95]  The panel unanimously recommended Mr. Reed to fill that opening.[96]  Chief Winter did not make a

---

[85]  *Id.* ¶ 22.

[86]  *Id.* ¶ 23.

[87]  *Id.* ¶¶ 18, 20.

[88]  *Id.* ¶ 20.

[89]  *Id.*

[90]  *Id.*

[91]  *Id.* ¶ 43.

[92]  *Id.*

[93]  *Id.* ¶ 44.

[94]  *Id.*

[95]  *Id.* ¶ 45.

[96]  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 114:15–18.  In his briefing, Mr. Reed says multiple times that the Chiefs-panel vote for the May 2018 promotion occurred a day before Chief Winter denied Mr. Reed the promotion to Battalion Chief in May of 2018.  Pl.'s Resp. to Defs.'s Mot. for Summ. J. (Doc. 18) at 11.  Mr. Reed also says that "[t]he failure to promote Plaintiff came one-day after the vote approving him . . . ."  *Id.* at 12.  But Mr. Reed's own deposition and admissions in his response to Defendants' Statement of Facts support the undisputed fact that the Chiefs panel voted in January of 2018 for the possible May 2018 promotion.  *See* Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 45; Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at

10

promotion announcement for the possible May 2018 opening at this time because such an announcement occurs only when a position is actually vacant.[97]   But just after the panel voted, another Battalion Chief, Charles Prout, told Mr. Reed that Mr. Reed was getting the next available Battalion Chief spot.[98]

At some point, Chief Winter received formal notification that Battalion Chief Jones was indeed going to retire in May of 2018.[99]   Then, "[w]ord began circulating around the [Conway Fire Department] that [Mr.] Reed was going to be promoted to the Battalion Chief position vacated by Mark Jones."[100]   As Mr. Jones's retirement drew closer, Chief Winter began receiving verbal complaints about Mr. Reed from several men on Mr. Reed's shift.[101]   Specifically, these men complained that Mr. Reed "belittle[d] and curse[d] them."[102]

Between May 21 and May 23, 2018, Chief Winter discussed the complaints about Mr. Reed with the Battalion Chiefs and Assistant Chiefs.[103]   Chief Winter asked them whether they believed

---

109:11–19.

[97]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 48.

[98]   *Id.* ¶ 49.

[99]   *Id.* ¶ 52.

[100]   *Id.* ¶ 53.

[101]   Ex. 2 (Winter Decl.) to Defs.' Statement of Facts (Doc. 16-2) ¶ 25.   Mr. Reed denies that Chief Winter received complaints at this time.   He says that "these allegations were only created after the denial of the promotion to [Mr.] Reed as a means to justify the already-made decision not to promote [Mr.] Reed."   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 54.   Mr. Reed also says that Chief Winter "later solicited [the complaints] for the purpose of covering-up the real reason for the failure to promote Plaintiff."   *Id.* ¶ 55.   Mr. Reed's bald assertions are wholly unsupported by any record evidence.   Mr. Reed has no personal knowledge about the timing of the complaints.   Mr. Reed doesn't say that any of the complaining firefighters told him the complaints came after the denial of the promotion.   Tellingly, Mr. Reed's counsel chose not to depose any of the complaining firefighters.   Mar. 18, 2022 Hr'g Tr. (Rough) at 36.   Mr. Reed's counsel gave the following reason for that choice: "[D]eponents just lie."   *Id.* Chief Winter provided a declaration saying that he received the verbal complaints before making the promotion decision.   Mr. Reed has provided no cognizable evidence to raise a genuine dispute of fact with respect to Chief Winter's declaration on this point.   The fact that Chief Winter received complaints before making the May 2018 promotion decision is thus undisputed for purposes of summary judgment.   *See* Fed. R. Civ. P. 56(e)(2) (stating that, "if a nonmovant . . . fails to properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed for purposes of the motion" for summary judgment).

[102]   Ex. 2 (Winter Decl.) to Defs.' Statement of Facts (Doc. 16-2) ¶ 25.

[103]   *Id.* ¶ 26.

Mr. Reed was still the person for the job.[104]   The majority of the Battalion Chiefs and Assistant Chiefs said that "it's [Mr. Reed's] time."[105]   Chief Winter also spoke with Mr. Johnson (now a Battalion Chief) about whether Mr. Johnson had any issues with Mr. Reed during the time Mr. Reed and Mr. Johnson were Captains at the same fire station.[106]   Mr. Johnson confirmed that Mr. Reed "cursed and belittled the men he worked with . . . ."[107]   Around this time, Chief Winter asked Mr. Johnson and the other firefighters who had complained about Mr. Reed's treatment of them "to put their respective complaints in writing."[108]

On May 23, 2018, Chief Winter "met with [Mr.] Reed, Battalion Chief Jones, and Battalion Chief Prout to discuss the character issues [Chief Winter] was being informed of regarding [Mr. Reed] with the name calling and belittling."[109]   Chief Winter specifically told Mr. Reed of verbal complaints that Chief Winter had received about Mr. Reed belittling subordinates at a March 2018 training exercise called Journeyman.[110]   Chief Winter told Mr. Reed that Mr. Reed would no longer be conducting Journeyman.[111]   Chief Winter also revealed to Mr. Reed that Chief Winter was "gathering some facts . . . to try to determine whether [Chief Winter] was going to promote [Mr. Reed] or not."[112]   This meeting was the first time Mr. Reed learned that he might not be getting the May 2018 promotion to Battalion Chief.[113]

---

[104] *Id.*

[105] *Id.*

[106] *Id.* ¶ 27.

[107] *Id.*

[108] *Id.* ¶¶ 27, 30.

[109] *Id.* ¶ 32; *see also* Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 116–117:3.

[110] Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 116:19–22, 154:19–25.

[111] *Id.* at 154:19–25.

[112] *Id.* at 116:25–117:3.

[113] Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 98.

The next day, May 24, 2018, Chief Winter met with Mr. Reed again.[114]  Chief Winter told Mr. Reed "that this was his time, and that [Chief] Winter had been going to promote [Mr.] Reed to Battalion Chief, but Chief Winter could not have him ([Mr.] Reed) in charge of a shift when he displayed these types of characteristics."[115]  Chief Winter then told Mr. Reed that Mr. Reed would not receive the promotion.[116]  Instead, Chief Winter promoted another union member, Mr. Moix, to the position.[117]

On the same day, Mr. Reed made a copy of his personnel file.[118]  The personnel file did not contain any mention of the verbal complaints Chief Winter raised with Mr. Reed during the May 23 and May 24, 2018 meetings.[119]  In June of 2018, Chief Winter received several written complaints from Conway firefighters about Mr. Reed's belittling behavior.[120]  As explained *supra*, Chief Winter had asked these firefighters to put in writing the verbal complaints they made to Chief Winter during the time period leading up to May 24, 2018.[121]  Justin Adlong wrote that Mr. Reed called subordinates "names such as [d]umbass, and dipshit" throughout the whole March 2018 Journeyman training exercise.[122]  Samuel Brannan wrote that, at Journeyman, Mr. Reed continuously called several probationary firefighters "dumbasses," "lazy asses," and "stupid."[123]

---

[114] *Id.* ¶ 100.

[115] *Id.*

[116] *Id.* ¶ 101.

[117] *Id.* ¶¶ 115, 156.  Chief Winter, from 2014 (the year he became Fire Chief) through May 27, 2018, has promoted six members of Local 4016 to the rank of Battalion Chief.  *Id.* ¶ 156.

[118] Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 188:22–189:6.

[119] *Id.* at 188–189:3.

[120] *See* Exs. 8–15 to Defs.' Statement of Facts (Docs. 16-8–16-15).

[121] Ex. 2 (Winter Decl.) to Defs.' Statement of Facts (Doc. 16-2) ¶ 30.

[122] Ex. 11 to Defs.' Statement of Facts (Doc. 16-11) at 1; *see also* Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 137:20–24 (Mr. Reed declining to call Mr. Adlong a liar with respect to Mr. Adlong's complaint).

[123] Ex. 12 to Defs.' Statement of Facts (Doc. 16-12) at 1; *see also* Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 140:10–14 (Mr. Reed testifying that he is not calling Mr. Brannan a liar with respect to Mr. Brannan's complaint).

A.E. Hurst wrote that, on March 30, 2018, Mr. Reed "blew up on [him] and went to cussing [him] . . . ."[124]

## DISCUSSION

Chief Winter and the City of Conway move for summary judgment on all claims against them.[125]  A court shall grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[126]  The moving party has the burden to show that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[127]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[128]

Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment . . . ."[129]  The dispute of fact must be both genuine and material to prevent summary judgment.[130]  A genuine dispute of fact exists where a rational juror could decide the particular question of fact for the nonmoving party.[131]  A material dispute of fact exists where the juror's

---

[124] Ex. 8 to Defs.' Statement of Facts (Doc. 16-8) at 1; *see also* Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 123:1–22 (Mr. Reed "not claiming that [Mr. Hurst is] lying" with respect to Mr. Hurst's complaint).  The record contains letters from other Conway firefighters describing similar treatment by Mr. Reed.  *See* Exs. 8–15 to Defs.' Statement of Facts (Docs. 16-8–16-15).

[125] Defs.' Mot. for Summ. J. (Doc. 15) at 2.

[126] *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citing FED. R. CIV. P. 56(c)(2)).

[127] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Technically, this case is set for a bench trial, which means the Court would ultimately sit as the trier of fact.  In any event, for purposes of this Order, the Court will use the rational juror standard.

[128] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[129] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[130] *Id.*

[131] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[132]

## I. Mr. Reed's First Amendment Retaliation Claim Against Chief Winter

Mr. Reed alleges that Chief Winter denied him the 2018 promotions to Battalion Chief in retaliation for Mr. Reed's exercise of his First Amendment rights.[133]  Chief Winter argues that he is entitled to summary judgment for two independent reasons: (1) Mr. Reed cannot establish a causal link between Mr. Reed's not receiving the promotions and his "participation in protected activity;" and (2) Mr. Reed cannot establish that Chief Winter's reasons for denying Mr. Reed the promotions were pretext for retaliation.[134]  The Court agrees on both points.

### A. The Applicable Legal Test

Mr. Reed does not suggest that he has any direct evidence of First Amendment retaliation. The record confirms that there is no such evidence.[135]  The parties agree that, in the absence of direct evidence, Mr. Reed's claim (for purposes of summary judgment) should be analyzed under

---

[132] *Id.*

[133] Compl. (Doc. 1) ¶¶ 26–35.  While Mr. Reed's Complaint seems to allege multiple instances of First Amendment Retaliation, Mr. Reed "stipulates to the dismissal of all non-2018 claims . . . ."  Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 18) at 1 n.1.  It is legally possible for Mr. Reed to make two types of claims—a First Amendment retaliation claim and a First Amendment discrimination claim.  In *Wagner v. Jones*, the Eighth Circuit highlighted a distinction between First Amendment discrimination and First Amendment retaliation.  664 F.3d 259, 269 (8th Cir. 2011).  Analogizing to Title VII claims, the Eighth Circuit explained that a First Amendment discrimination claim "seeks to prevent injury to individuals based on who they are, *i.e.*, their status."  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)).  Conversely, First Amendment retaliation claims "seek to prevent harm to individuals based on what they do, *i.e.*, their conduct."  *Id.* (quoting *Burlington*, 548 U.S. at 63).  Mr. Reed's claim is based in part on his status as a union member.  So an argument could be made that Mr. Reed has a discrimination claim and a retaliation claim.  But neither party has even hinted at a potential First Amendment discrimination claim.  The Court will not conjure up this claim on its own.  So the only First Amendment claims addressed here are the retaliation claims.

[134] Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 17) at 43, 56–57.

[135] The Eighth Circuit describes "[d]irect evidence of retaliation" as "evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct."  *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014).  There is no whiff in the record of direct evidence that Mr. Reed's First Amendment protected activity is directly linked to Chief Winter's promotion decisions.

a burden-shifting framework.[136]  But the parties have not provided very clear guidance or caselaw support as to what burden-shifting framework applies to a public employee's claim of First Amendment retaliation.  This is not really the parties' fault, as the Eighth Circuit precedent has not consistently taken, or settled on, one approach.[137]

Although the appropriate test is not free from doubt, the Court concludes that a recent Eighth Circuit opinion—*Henry v. Johnson*—provides the most logical way forward in First Amendment retaliation cases involving only circumstantial evidence.[138]  In *Henry*, Judge Grasz, joined by Judges Shepherd and Kobes, convincingly united the two tests historically used in this Circuit.  According to *Henry*, the *prima facie* case requires Mr. Reed to show (1) that "he engaged in First-Amendment-protected activity;" (2) that Chief Winter "took an adverse employment action against him;" and (3) that the "protected [activity] was a substantial or motivating factor in [Chief Winter's] decision to take the adverse employment action."[139]  If a plaintiff prevails on the *prima facie* test, then he wins the case unless the defendant can prove that it would have taken the same adverse employment action absent the protected activity.

---

[136] *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 18) at 7–8; Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 17) at 33–34.

[137] In cases lacking direct evidence of retaliation, there are seemingly two choices: (1) the burden-shifting framework announced by the Supreme Court in *Mount Healthy v. Doyle*; or (2) the *McDonnell Douglas* burden-shifting framework.  *See Davison v. City of Minneapolis*, 490 F.3d 648, 655 n.5; *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977).  Although the *prima facie* cases in both frameworks are very similar, the burden-shifting consequences of making out a *prima facie* case are significantly different.  In short, it is harder for Plaintiffs to ultimately prevail on a claim using the *McDonnell Douglas* framework.  *Compare Davison*, 490 F.3d at 654–55 (8th Cir. 2007), *with Hughes v. Stottlemyre*, 506 F.3d 675, 678–79 (8th Cir. 2007).  In *Davison*, a divided panel of the Eighth Circuit flagged an intra-circuit conflict on the question of whether direct evidence of retaliation is required to trigger the *Mount Healthy* framework.  *Davison*, 490 F.3d at 655 n.5.  Some cases, according to the majority, stated "that the *Mount Healthy* framework applies only where the plaintiff has presented direct evidence showing that the employer used the plaintiff's protected speech as a criterion in the employment decision."  *Id.*  "In contrast," the majority noted, other Eighth Circuit decisions "have employed the *Mount Healthy* framework in First Amendment cases without requiring that the plaintiff present direct evidence."  *Id.*  This divide endures today.

[138] 950 F.3d 1005 (8th Cir. 2020).

[139] *Id.* at 1011.

The first two prongs of *Henry*'s *prima facie* case are self-explanatory. But the third prong requires further discussion. That prong contains its own "three-part, burden-shifting inquiry."[140] Part one of this sub-test requires Mr. Reed to "show that he suffered an adverse employment action that was causally connected to his participation in a protected activity."[141] If Mr. Reed does so, the Court moves on to part two of the sub-test, where "the burden shifts to [Chief Winter] to show a legitimate, nondiscriminatory reason for his . . . actions."[142] And if Chief Winter makes that showing, part three of the sub-test shifts the burden "back to [Mr. Reed] to show that [Chief Winter's] actions were a pretext for illegal retaliation."[143]

## B. Application of the Test to Mr. Reed's Claim

Mr. Reed meets the first two prongs of his *prima facie* case under *Henry*. With respect to whether Mr. Reed engaged in protected activity, Chief Winter concedes (for purposes of summary judgment) that Mr. Reed's participation in the *Shumate* lawsuit was a protected activity.[144] Additionally, the "freedom of association is a basic constitutional freedom . . . ."[145] "Freedom of association includes membership in unions or other organizations concerned with 'business and economic causes.'"[146] Thus, Mr. Reed's membership in the firefighter's union was protected activity as well.[147]

---

[140] *Id.* at 1014.

[141] *Id.* (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018–19 (8th Cir. 2008)).

[142] *Id.* (quoting *Morris*, 512 F.3d at 1019).

[143] *Id.* (quoting *Morris*, 512 F.3d at 1019).

[144] Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 17) at 36.

[145] *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 525 F.3d 1074, 1081 (8th Cir. 2008).

[146] *Greminger v. Seaborne*, 584 F.2d 275, 278 (8th Cir. 1978).

[147] *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law, not fact.").

With respect to whether Mr. Reed suffered an adverse employment action, Chief Winter admits that "being passed over for a promotion may constitute an adverse employment action."[148] That's a wise admission.  The Eighth Circuit says that an adverse employment action "is exhibited by a *material* employment disadvantage, such as a change in salary, benefits, or responsibilities."[149]  It is undisputed that Mr. Reed did not get a promotion to Battalion Chief.  It is undisputed that Mr. Reed's salary would have increased had he gotten the promotion.  A rational juror could readily find that Mr. Reed's not attaining a higher rank with better pay constituted an adverse employment action.

Mr. Reed's First Amendment retaliation claim falters on the third prong of his *prima facie* case.  To get past the third prong of his *prima facie* showing, Mr. Reed provide evidence that could persuade a convince a rational juror that Mr. Reed's "protected speech was a substantial or motivating factor in [the Defendants'] decision to take the adverse employment action."[150] "While causation is generally a jury question, this [C]ourt must decide if sufficient evidence exists to create a factual question for the jury."[151]  To make that decision, the Court must determine whether Mr. Reed can, on this record, navigate (for summary judgment purposes) *Henry*'s three-part sub-test.  He cannot.

On part one of *Henry*'s sub-test, Mr. Reed must provide evidence from which a rational juror could conclude that Mr. Reed "suffered an adverse employment action that was causally connected to h[is] participation in a protected activity."[152]  In the Eighth Circuit, "[t]o prove a

---

[148] Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 17) at 38.

[149] *Myers v. Starke*, 420 F.3d 738, 744 (8th Cir. 2005) (internal quotations omitted) (citation omitted).

[150] *Henry*, 950 F.3d at 1014.

[151] *Id.*

[152] *Ackerman v. Iowa*, 19 F.4th 1045, 1059 (8th Cir. 2021) (quoting *Henry*, 950 F.3d at 1014).

causal connection, . . . a plaintiff must prove an employer's retaliatory motive played a part in the adverse employment action."[153]  "[E]vidence that gives rise to an inference of retaliatory motive on the part of the employer is sufficient to prove a causal connection" at the *prima facie* stage.[154]

Mr. Reed does not direct the Court to any evidence that Chief Winter's promotion decisions were somehow influenced by Mr. Reed's union membership or his participation in a long-running lawsuit against the City of Conway (but not against Chief Winter or any fire personnel).  No record evidence suggests that Chief Winter was opposed to the union at all.  No record evidence suggests that Chief Winter was concerned in any way about the lawsuit either.

Perhaps recognizing this glaring hole in his case, Mr. Reed argues that the temporal proximity between the 2018 promotion denials and his protected activity is enough to satisfy the causation element.[155]  But, on this record, temporal proximity alone is not enough to get Mr. Reed over the causation hurdle.  The Eighth Circuit acknowledges that temporal proximity between protected activity and an adverse employment action can be "sufficient to create an inference of retaliation."[156]  But "[g]enerally, more than a temporal connection between protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."[157]  According to the Eighth Circuit, "for temporal proximity alone to be sufficient, 'the temporal proximity must be very close.'"[158]  And while the Eighth Circuit hasn't established a dividing line

---

[153] *Hughes*, 454 F.3d at 797.

[154] *Id.*

[155] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 18) at 11.

[156] *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105 (8th Cir. 2011), *abrogated on other grounds by Torgerson v. City of Minneapolis*, 643 F.3d 1031, 1043, 1059 (8th Cir. 2011).

[157] *Cf. Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999) (en banc)).

[158] *Id.* (quoting *Hite v. Vermeer Mfg.*, 446 F.3d 858, 866 (8th Cir. 2006)).

between "very close" and not close enough, it has indicated that "[m]ore than two months is too long to support a finding of causation without something more."[159]

Temporal proximity does not work for Mr. Reed.  Mr. Reed argues that that his "speech was ongoing at the time" he was passed over in May of 2018.[160]  But he doesn't support this argument.  To determine when the temporal-proximity clock starts, the Eighth Circuit looks to "the date [Chief Winter] knew of" Mr. Reed's protected activity.[161]  With respect to the 2012 *Shumate* lawsuit, Mr. Reed submitted an affidavit in the case in January of 2015.  That is the last action Mr. Reed took in the lawsuit.  To be sure, the case languished on for another four years.  But being a named plaintiff in a long-running lawsuit does not mean that Mr. Reed was cloaked in a perpetual-protected-activity status for temporal-proximity purposes.  Assuming Chief Winter even knew about the 2012 lawsuit and about Mr. Reed's 2015 affidavit, the latest the temporal-proximity clock started was January of 2015.[162]  The promotion decisions occurred nearly three years later.  That's far too long to allow a rational juror to infer a causal connection between the protected activity and the promotion decisions.

With respect to his union membership, Mr. Reed gave up his role as president in March of 2015.  Since then, it is undisputed that Mr. Reed's only union related conduct consisted of his participation as a named plaintiff in *Shumate*.[163]  Again, Mr. Reed being a named plaintiff in a

---

[159] *Id.*

[160] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 19) at 13.

[161] *Cf. Sisk*, 669 F.3d at 901.

[162] There is no evidence that Chief Winter knew about the affidavit.  With respect to the *Shumate* case generally, Mr. Reed testified that Chief Winter knew about the litigation.  Ex. 1 (Reed Dep.) to Defs.' Statement of Facts (Doc. 16-1) at 197:10–12.  But Mr. Reed offers nothing to indicate how he knows Chief Winter knew about the litigation.  Without personal knowledge, Mr. Reed is merely speculating.  Speculation is not enough to raise a genuine dispute of fact.

[163] *See id.* at 61:7–11.  At his deposition, Chief Winter's counsel asked Mr. Reed, "Other than your participation in the Shumate lawsuit, after you've ceased serving in an official leadership role with the union, are you engaging in any other conduct on behalf of the union?"  *Id.* at 61:7–10.  Mr. Reed said that he was not.  *Id.* at 61:11.

lawsuit filed in 2012 (and one in which Mr. Reed had not actively participated since 2015) does not mean that he was engaged in "ongoing speech."  Because Mr. Reed did nothing active in the union (i.e., no protected activity) since, at the latest, March of 2015, we again have a gap of nearly three years between protected activity and the promotion decisions—a gap that is far too long to get Mr. Reed past part one of *Henry*'s prong-three sub-test.

In any event, Mr. Reed also cannot survive the rest of the *Henry* sub-test.  For part two of the *Henry* sub-test, "the burden [of production] shifts to [Chief Winter] to show a legitimate, nondiscriminatory reason for his . . . actions."[164]  Chief Winter has done so.  That is, Chief Winter has "introduced evidence which, *taken as true*, would *permit* the conclusion that there was a non[retaliatory] reason for the adverse action[s]."[165]  With respect to the February 2018 promotion, Chief Winter says he accepted the recommendation of the Chiefs panel and promoted Mr. Johnson to Battalion Chief.  A rational juror could find that Chief Winter's decision to follow the vote of the Chiefs panel was a legitimate, nonretaliatory reason for the February 2018 promotion decision. With respect to the May 2018 promotion, Chief Winter says he did not promote Mr. Reed because of the verbal complaints Chief Winter received about Mr. Reed's belittling and cursing of subordinates.  A rational juror could find that behavior to be a legitimate, nonretaliatory reason for Chief Winter to deny Mr. Reed the May 2018 promotion.  Chief Winter has met his burden of production.

For part three of the sub-test, "the burden shifts back to [Mr. Reed] to show that [Chief Winter's] actions were a pretext for illegal retaliation."[166]  To do so, Mr. Reed "must establish [that] a factual question exists as to whether [Chief Winter's] reasons were mere pretext, a difficult

---

[164] *Henry*, 950 F.3d at 1014 (quoting *Morris*, 512 F.3d at 1019).

[165] *Cf. St. Mary's Honor Cent. v. Hicks*, 509 U.S. 502, 509 (1993).

[166] *Henry*, 950 F.3d at 1014 (quoting *Morris*, 512 F.3d at 1019).

burden to prove 'because evidence of pretext and [retaliation] is viewed in the light of the employer's justifications.'"[167]  Mr. Reed presses no arguments concerning the February 2018 promotion.  Mr. Reed presses a few pretext arguments concerning the May 2018 promotion.  They are meritless, and no rational juror could conclude otherwise.

First, Mr. Reed points to the fact that he was the unanimous vote of the Chiefs panel for the May 2018 promotion.[168]  He says that this "favorable review" is evidence of pretext.[169]  The fatal flaw with this argument is timing.  Recall that the Chiefs panel voted for Mr. Reed in January of 2018.  Chief Winter did not receive the complaints about Mr. Reed until months after the vote, when word got out that Mr. Reed would be getting promoted.  So neither Chief Winter nor the Chiefs panel knew, at the time of this so-called favorable review, that Mr. Reed was belittling subordinates.  "A [favorable] review issued without that knowledge is irrelevant to whether" Chief Winter actually denied Mr. Reed the May 2018 promotion because of the subsequent complaints.[170]

Second, Mr. Reed argues that Chief Winter "conjured" up all of the complaints about Mr. Reed *after* Chief Winter denied Mr. Reed the May 2018 promotion.[171]  This is an argument aimed at showing that Chief Winter did not have a factual basis for denying Mr. Reed the promotion.  Based on this record, no rational juror could agree with Mr. Reed.  It is not genuinely disputed that

---

[167] *Id.* (quoting *Morris*, 512 F.3d at 1019).

[168] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 18) at 14.

[169] *Id.* at 15.

[170] *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002).

[171] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 18) at 15.  Mr. Reed's argument alludes to a June 2018 writing that Battalion Chief Chad Johnson sent to Chief Winter that said, "Chief, per your request I am writing to provide . . . a written account of some inappropriate language/behavior made by Captain Reed."  *Id.* at 16 (citing Ex. 9 to Defs.' Statement of Facts (Doc. 16-9) at 1).  The "per your request" language refers to the undisputed fact that Chief Winter asked complaining firefighters to put verbal complaints in writing before the May 2018 promotion decision.  No rational juror could conclude otherwise.

Chief Winter, before denying Mr. Reed the May 2018 promotion, received verbal complaints about Mr. Reed from numerous firefighters.[172]  And Mr. Reed never seriously challenges the substance of the complaints (that Mr. Reed belittled and cursed subordinates).[173]  Moreover, it is not genuinely disputed that Chief Winter, before denying Mr. Reed the May 2018 promotion, asked the complaining firefighters to put their complaints in writing.[174]  The take-away is that, on this record, a rational juror could only conclude that Chief Winter received verbal complaints about Mr. Reed's belittling of subordinates before he denied Mr. Reed the May 2018 promotion.  And a rational juror could only conclude that Chief Winter based his promotion denial on those verbal complaints.  The fact that Chief Winter later received these complaints in written form (as he had previously requested) after the May 2018 promotion denial is not enough to allow a rational juror to find that Chief Winter's proffered reason for the promotion denial was pretext for retaliation.[175]

Third and finally, Mr. Reed argues that pretext is evident here based on an "escalating campaign of retaliation."[176]  For this argument, Mr. Reed relies on the "two lawsuits in which [Mr. Reed] has won the relief he sought," and Mr. Reed's success in getting then-Chief Castleberry's prior restraint rescinded.[177]  None of this has anything to do with Chief Winter.  Recall, Chief Winter became Fire Chief in 2014—well after the lawsuits were filed (in 2010 and 2012).  And then-Chief Castleberry (not Chief Winter) issued the 2001 memorandum curtailing firefighters'

---

[172] *Id.* at 15.  *See also supra* note 101.

[173] Mr. Reed suggests that he "disagrees with what [the complaining firefighters] said; but there is a difference between them affirmatively misrepresenting and being subject to an untruthfulness charge vs. cavalierly misremembering in service of giving their ultimate boss what he wants in writing."  *See, e.g.*, Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 69.  Whatever this convoluted contention means, it is not enough to raise a genuine dispute about the substance of the complaints.

[174] *Id.* ¶ 58.

[175] That these written complaints were not finalized and put in Mr. Reed's personnel file by May 24, 2018, is also of no moment.

[176] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 16) at 16.

[177] *Id.* at 16.

speech rights.[178]  Chief Winter was not a defendant in either lawsuit and had nothing to do with the 2001 memorandum.  There's nothing that could possibly persuade a rational juror that Chief Winter's proffered reason for not promoting Mr. Reed in May of 2018 was pretext for this so-called "escalating campaign of retaliation."[179]

## II.  Mr. Reed's First Amendment Retaliation Claim Against the City of Conway

Mr. Reed's claim against the City of Conway cannot survive summary judgment because (as just explained) no rational juror could conclude that Mr. Reed suffered a constitutional violation in the first place.  "Under *Monell*, 'a local government is liable under § 1983 for its policies that cause constitutional torts.'"[180]  "It follows that, absent a constitutional violation by a [city] employee, there can be no § 1983 or *Monell* liability for the [city]."[181]

## III.  Mr. Reed's Claims under Arkansas Law

The Court has concluded that all of Mr. Reed's federal claims fail on summary judgment. Defendants argue that the Court should decline to exercise supplemental jurisdiction over Mr. Reed's remaining claims under the 34th Amendment to the Arkansas Constitution and Arkansas Code Annotated section 11-3-303.[182]  The Court agrees.

---

[178] In fact, Chief Winter was actually a class member in *Shumate* and stood to gain from a favorable outcome in that lawsuit.  *See* Pl.'s Resp. to Defs.' Statement of Facts (Doc. 19) ¶ 121 ("Anyone employed at the CFD who was not already maxed out in their pay grade benefitted financially from the *Shumate* settlement, including Chief Winter.").

[179] Chief Winter also argues that he is entitled to qualified immunity.  Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 17) at 61–62. "At summary judgment, qualified immunity shields a [government official] from liability in a § 1983 action unless: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional . . . right; and (2) the right was clearly established at the time of the deprivation.'"  *Barton v. Taber*, 908 F.3d 1119, 1123 (8th Cir. 2018) (quoting *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009)).  The Court has determined that no rational juror could find that Chief Winter violated Mr. Reed's constitutional rights.  Thus, Chief Winter is entitled to qualified immunity as well.

[180] *Kingsley v. Lawrence Cnty.*, 964 F.3d 690, 703 (8th Cir. 2020) (quoting *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (2018)).

[181] *Id.* (quoting *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018)).

[182] Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 17) at 66.

"[D]istrict courts may decline to exercise supplemental jurisdiction over a claim" otherwise falling under the Court's supplemental jurisdiction for a few reasons.[183]   Most relevant here, pursuant to 28 U.S.C. § 1367(c)(3), the Court can decline to exercise supplemental jurisdiction over a claim when "the district court has dismissed all claims over which it has original jurisdiction."  Mr. Reed's First Amendment retaliation claims (against Chief Winter and the City of Conway) are the only claims that fall under the Court's original jurisdiction.[184]  Pursuant to this Order, those claims are out.  The remaining state law claims are not simple mirrors of the federal claims.  They present unique issues of state law that the state courts should have a chance to resolve.  Those claims will be dismissed without prejudice.

## CONCLUSION

Based on the foregoing, the Court GRANTS summary judgment to Chief Winter and the City of Conway on all federal claims against them, and DISMISSES without prejudice all of the state law claims.

IT IS SO ORDERED this 24th day of August 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[183] 28 U.S.C. § 1367(c).

[184] *See id.* § 1331 (conferring upon district courts "original jurisdiction of all actions arising under the Constitution . . .").